UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIDGEPORT HARBOUR PLACE I, .    Case No. 3:01-CV-02162
                             .    (AHN)
LLC,                         .
                             .
        Plaintiff,           .
                             .    Bridgeport, Connecticut
    v.                       .    July 14, 2003
                             .
JOSEPH P. GANIM, ET AL.,     .
                             .
        Defendants.          .
. . . . . . . . . . . . . . .

ORAL ARGUMENT ON MOTION TO DISMISS
BEFORE THE HONORABLE ALAN H. NEVAS
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:       Sweeney & Griffin
                         By:  WILLIAM J. SWEENEY, ESQ.
                         114 West Main Street
                         P.O. Box 337
                         New Britain, CT 06050

                         Gallagher & Calistro
                         By:  WILLIAM F. GALLAGHER, ESQ.
                         P.O. Box 1925
                         New Haven, CT 06509

For Defendant Ganim:     Dechert
                         By:  MICHAEL J. GILBERT, ESQ.
                         30 Rockefeller Plaza
                         New York, NY 10112

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

APPEARANCES (CONTINUED):

```
For Defendants          Jacobs, Grudberg, Belt
Lenoci, Sr.; Lenoci     & Dow, PC
Jr.; United Prop, LTD;  By:  DAVID L. BELT, ESQ.
815 Lafayette Center;        IRA B. GRUDBERG, ESQ.
United Investments;     350 Orange Street
LLC; United Envir       P.O. Box 606
Development Co.:        New Haven, CT 06503


For Defendants          Cowdery, Ecker & Murphy
Grimaldi and            By:  JAMES T. COWDERY, ESQ.
Harbour Communications,      750 Main Street, Ste. 910
Inc.:                   Hartford, CT 06103


For Defendants          Robinson & Cole
Murphy and Freimuth:    By:  EDWARD J. HEATH, ESQ.
                        280 Trumbull Street
                        Hartford, CT 06103


For Defendants Pinto:   Pepe & Hazard
and Kasper Group,       By: HAROLD J. PICKERSTEIN, ESQ.
Inc.:                   30 Jelliff Lane
                        Southport, CT 06890


For Defendants          Santos & Seeley
Willinger; Willinger,   By:  SANDRA SNADER, ESQ.
Willinger & Bucci:      51 Russ Street
                        Hartford, CT 06106


Electronic Court        MS. MARIA CORRIETTE:
Recorder Operator:
```

1          (Proceedings commenced at 9:30 a.m.)

2               THE COURT:  Morning.

3               COUNSEL:  Morning, Your Honor.

4               THE COURT:  Before we start with the motion

5     to dismiss, there are some miscellaneous motions that

6     are pending.

7               Are any -- Can any of those be resolved?  Let

8     me just --

9               UNIDENTIFIED SPEAKER:  If Your Honor please,

10    on the most recent motion for default, I think most

11    people had objected to those interrogatories.

12              We had filed ours and Mr. Sweeney doesn't

13    have it.  I will send copies to all of the plaintiffs'

14    counsel, and if need be, I'll file a notice to that

15    (unintelligible).

16              MR. SWEENEY:  Your Honor, for the record,

17    William Sweeney.

18              The only housekeeping issue that I'm aware

19    of, on behalf of the plaintiffs, within the report of

20    the parties that the Court entered as an order of --

21              THE COURT:  Yes.

22              MR. SWEENEY:  -- June 3rd, there was Number

23    4, Your Honor, was that all defendants will comply, in

24    writing, within 20 days of the acceptance

25    (unintelligible) the plaintiffs' request for production

1    and request for interrogatories, both dated January

2    14th, 2003.

3              And that, Your Honor, in general terms, was

4    the insurance disclosure requirement, or request.

5              THE COURT:  Has that been complied with?

6              MR. SWEENEY:  It hasn't been complied with,

7    Your Honor.

8              THE COURT:  Has not?

9              MR. SWEENEY:  Mr. Grudberg indicates to me

10   that he's filed something.  I didn't have a record of

11   it, but if he's got a copy of it, or he's gonna file

12   it, I mean, --

13             MR. GRUDBERG:  I didn't file (unintelligible)

14   under the rules.  I sent you the original.  I will sign

15   the one I've got and send it to you, --

16             MR. SWEENEY:  Well, I --

17             MR. GRUDBERG:  -- and I'll file a notice.

18             MR. SWEENEY:  We look at this as purely a

19   housekeeping matter, Your Honor.  We're just trying to

20   find out what's out there, as far as coverage, and we

21   want each defendant on the record as to what it is --

22             THE COURT:  I understand that, and we talked

23   about that the last time we were here, and it was my

24   understanding that that was going to be taken care of

25   promptly.

1          MR. SWEENEY:  Well, Your Honor, to -- I don't

2    have any compliance, Your Honor.

3          I've had verbal indications but --

4          THE COURT:  Well, who is the -- who has

5    insurance?  Who --

6          MS. SNADER:  Your Honor, if I may, Sandra

7    Snader from Santos & Seeley, for Charles Willinger and

8    Willinger, Willinger & Bucci.

9          We (unintelligible) insurance policy, and I

10   am prepared to make a disclosure to Mr. Sweeney today.

11         THE COURT:  Well, why did we wait until today

12   to make the disclosure?  Why wasn't that done weeks

13   ago?  Why --

14         MS. SNADER:  I apologize, Your Honor, but I

15   just received the information and declarations page

16   from my client.

17         The information does go back a few years, and

18   it took my client a little while to clear -- to figure

19   out what the coverage was at the time.

20         THE COURT:  All right.

21         You want to make the disclosure now, please?

22         MS. SNADER:  Your Honor, I don't have

23   anything in writing with me at this point.  I can

24   verbally make a disclosure to Mr. Sweeney.

25         THE COURT:  Well, put it on the record.

1              MS. SNADER:  Our insurance coverage is three

2    million for -- three million, five million.  Let's see.

3         (Pause.)

4              MS. SNADER:  And the coverage is with

5    (unintelligible).

6              THE COURT:  Okay.

7              What about you, Mr. Grudberg?

8              MR. GRUDBERG:  It was done in February.  We

9    have no coverage --

10             THE COURT:  You have no coverage?

11             MR. GRUDBERG:  -- no coverage that would

12   cover RICO claims.

13             THE COURT:  All right.

14             Anybody else that had to make a disclosure?

15             UNIDENTIFIED SPEAKER:  Yes, Your Honor, on

16   behalf of Mr. Ganim, we also have no coverage.  We

17   haven't filed a formal response, and we'll do that

18   promptly.

19             THE COURT:  But there's no coverage?

20             UNIDENTIFIED SPEAKER:  Correct.

21             THE COURT:  Mr. Pickerstein?

22             MR. PICKERSTEIN:  On behalf of Mr. Pinto and

23   Kasper Group, Your Honor, I thought we had disclosed on

24   the record last time, that we had no coverage.  We have

25   no coverage.  I'm more than happy to file a writing, if

1    Mr. Sweeney wants one.

2              THE COURT:  All right.

3              MR. COWDERY:  James Cowdery on behalf of

4    Leonard Grimaldi and Harbour Communications.

5              The last time in court I disclosed in open

6    court that Mr. Grimaldi and Harbour Communications have

7    no coverage, and again, if Mr. Sweeney needs a --

8              THE COURT:  All right.

9              MR. HEATH:  Your Honor, Edward Heath on

10   behalf of the City of Bridgeport defendants, Michael

11   Freimuth and Dennis Murphy.

12             I believed that we had responded, but on

13   checking my file, we have not.  I will get those

14   responses to Mr. Sweeney today.

15             THE COURT:  And what are the response -- what

16   is the --

17             MR. HEATH:  For the individual defendants

18   there is no insurance coverage.  I'm not certain of the

19   City's answer, at this time.

20             THE COURT:  All right.

21             Now, if you'll look at your report of the

22   parties, dated May 28th, and go to -- starting with c.

23   on the second page -- starting with d., excuse me, d.,

24   what about those motions?  Putting aside the motions to

25   dismiss, of course, which we'll take up this morning,

1    but the motion to join, is that still outstanding?

2         MR. SWEENEY:  I believe, Your Honor, we

3    submitted the revised complaint to Mr. Grudberg, and

4    asked that he comply with the requirements with respect

5    to waiver of service, and I --

6         MR. GRUDBERG:  I don't know whether he got a

7    -- an answer on his motion, but we did send the -- in

8    the last few days, a new complaint which added Mr.

9    Schinella.  I have signed the thing.  It will be in the

10   mail to Mr. Sweeney within a day or two.

11        THE COURT:  So that motion can be granted?

12        MR. SWEENEY:  I thought the Court already

13   granted it, Your Honor, but --

14        THE COURT:  Well, I don't know.  It's --

15        MR. SWEENEY:  Well, --

16        THE COURT:  It shows on your report as

17   outstanding.

18        MR. SWEENEY:  Well, it was at the time of the

19   report, Your Honor, but I think subsequently -- for

20   whatever reasons, we've submitted the revised complaint

21   to Mr. Grudberg, with a waiver of service --

22        THE COURT:  All right.

23        If it has not been granted, it can be

24   granted?

25        MR. SWEENEY:  Yes, Your Honor.

```
 1              THE COURT:  Okay.
 2              What about h.?
 3              MR. SWEENEY:  That's been withdrawn, Your
 4  Honor.  I filed a withdrawal --
 5              THE COURT:  Okay.  h. has been withdrawn.
 6              j.?
 7              MR. SWEENEY:  Your Honor, that would all be
 8  the same motion -- same motions to strike.  I think I
 9  filed -- There were original motions filed.  I filed an
10  original motion to strike, and as each defendant
11  incorporated or docketed, I filed a motion to strike,
12  so the motions to strike are withdrawn.
13              So the motions to strike are all withdrawn.
14              THE COURT:  Okay.
15              So j. is withdrawn.
16              k., that, I take it, can be granted?
17              MR. SWEENEY:  That's granted, Your Honor.
18  That's what we're gonna argue today, I believe.
19              THE COURT:  Well, the motion to extend time.
20              MR. SWEENEY:  Right.  Right.  Yes, that's
21  correct.
22              THE COURT:  All right.
23              So k. can be granted?
24              MR. SWEENEY:  Yes, Your Honor.
25              MR. GRUDBERG:  If the Court please, going
```

1    back to the motion concerning adding Mr. Schinella, in

2    fact, the Court did grant that on June 12th.

3              THE COURT:  Okay.  Thank you.

4              Okay, l.?

5              MR. GRUDBERG:  That, I think he's agreed to.

6    That just had to do with the motion he had filed for

7    default --

8              MR. SWEENEY:  That's correct, Your Honor.

9    The motions for -- the motion for default that I filed

10   with respect to the motion -- The motion for default

11   that, exclude -- excluding the last one, Your Honor,

12   was addressed to answering the pleadings.  That's when

13   it was withdrawn -- our motion for default was

14   withdrawn.

15             So his motion can be either granted or

16   withdrawn.  I --

17             THE COURT:  So l. --

18             MR. GRUDBERG:  l. and m., I think, can be

19   granted, if the Court pleases.

20             THE COURT:  l. would be granted, and m.?

21             MR. SWEENEY:  Well, Your Honor, again, I

22   guess we would withdraw our objection.

23             THE COURT:  All right.

24             So m. is withdrawn.

25             MR. SWEENEY:  Same thing is true with --

```
 1              THE COURT:  n.?
 2              MR. SWEENEY:  n.  Yes, Your Honor.
 3              THE COURT:  All right.
 4              n. is withdrawn.
 5              o.?
 6              MR. SWEENEY:  Same thing, Your Honor.  We'll
 7    withdraw --
 8              THE COURT:  o. is withdrawn.
 9              p.?
10              MR. SWEENEY:  Same -- We'll withdraw that,
11    Your Honor.
12              THE COURT:  All right.
13              p. is withdrawn.
14              q.?
15              MR. SWEENEY:  That's the motion for insurance
16    information.
17              THE COURT:  All right.
18              Has that ever been acted on, q.?  If it
19    isn't --
20              MR. SWEENEY:  It has not been --
21              THE COURT:  -- I should grant that.
22              MR. SWEENEY:  Thank you, Your Honor.
23              THE COURT:  All right.
24              q. is granted.
25              r. should be granted, if it hasn't been.
```

1              MR. SWEENEY:  That's -- We would have no

2    objection to that, Your Honor.

3              THE COURT:  All right.

4              MR. SWEENEY:  I think r. is the --

5    Willinger's adoption of the --

6              THE COURT:  Of the motion, right.

7              MR. SWEENEY:  -- of Ganim's motion, and then

8    s. would be their adoption of the Lenoci motion.  So we

9    have no objection.

10             t. --

11             THE COURT:  s. should be granted, as well.

12             MR. SWEENEY:  Correct, Your Honor.

13             THE COURT:  t.?

14             MR. GRUDBERG:  t. is (unintelligible), if the

15   Court please.  One is production, one is

16   interrogatories.  (Unintelligible.)

17             MR. SWEENEY:  They're the same request.  One

18   was -- They're both related to the insurance --

19             THE COURT:  Okay.

20             MR. SWEENEY:  -- information, and so we would

21   ask that that be granted.

22             THE COURT:  t. is granted.

23             u.?

24             MR. PICKERSTEIN:  That's with respect to

25   insurance information, Your Honor.  I suppose that can

1    be denied (unintelligible) moot on that.

2             THE COURT:  All right.

3             u. is denied.

4             Same with v.?

5             MR. COWDERY:  v. and w. are the same, and

6    they can be denied as moot.

7             THE COURT:  Okay.

8             v. and w. are denied.

9             x. the same?

10            MR. SKLAIRE:  Yes, Your Honor, x. is the

11   same.

12            THE COURT:  And y. also?

13            MR. SKLAIRE:  Yes, Your Honor.

14            THE COURT:  All right.

15            x. and y. are denied.

16            MR. SKLAIRE:  In fact, Your Honor, it's all

17   the way through cc.

18            THE COURT:  Okay.

19            So x through cc. on the third page, can all

20   be denied.

21            And then you've reached agreement as to the

22   motions listed in Roman III.

23        (The Court and the Clerk confer.)

24            THE COURT:  Okay.

25            That brings us to the motion to dismiss,

14

1    unless there's anything else.

2          MR. SWEENEY:  No, Your Honor, nothing besides

3    the motions to dismiss, from the plaintiff's

4    perspective.

5          MR. SKLAIRE:  Your Honor, Michael Sklaire for

6    the government.

7          With the Court's permission, if I may be

8    excused from the further proceedings today, as we have

9    no --

10          THE COURT:  Yes.

11          MR. SKLAIRE:  Thank you.

12          THE COURT:  All right.

13          Who's taking the lead on the motion to

14    dismiss?

15          MR. GILBERT:  Your Honor, on behalf of Mr.

16    Ganim, Michael Gilbert.  I'll address the first three

17    counts of the complaint, the RICO allegations, and the

18    Section 1983.

19          As the Court knows, the plaintiff here

20    alleges that it was unable to complete a proposed

21    development project on the waterfront, allegedly as a

22    result of the acts, of the defendants.  The complaint

23    has got eight counts, names Joseph Ganim, the former

24    mayor of Bridgeport, in six of those counts.

25          I'm going to address, as I said, Counts One

1    and Two, the RICO allegations; and Count Three, the

2    Section 1983 allegation, although I note that Mr. Ganim

3    has joined in the motion to dismiss the state court

4    counts that's been filed by some of the other

5    defendants.

6         We raise three principal arguments in

7    support of the motion to dismiss the RICO allegations.

8         The first is that the plaintiff does not

9    have standing because the complaint does not, and the

10   plaintiff cannot satisfy the Supreme court test for

11   proximate causation in the Holmes decision;

12        second, the plaintiff's claim for a hundred

13   million dollars in lost profits is far too speculative

14   to support a RICO action;

15        and third, the plaintiff has completely

16   failed to plead the requisite predicate Rico acts.

17        I'll start with the proximate causation

18   argument, Your Honor.

19        In order to have standing under RICO, and

20   under the supreme court decision in Holmes, there must

21   be a direct relation between the alleged RICO violation

22   and a plaintiff's injuries, sufficient to satisfy the

23   proximate causation requirement, and the plaintiff here

24   cannot satisfy that requirement.

25        The development project the plaintiff

1    complains about, and alleges to have been denied the

2    opportunity to complete, is -- based on the plaintiff's

3    own allegations, it was merely a proposal, and it was

4    only in its preliminary stages.

5            Not one a shovelful of ground was ever broken

6    on construction.  The plaintiff never received a deed

7    to one inch of property, and a minefield of potential

8    pitfalls would've had to have been navigated before

9    this project could ever have gotten off the ground.  It

10    was a project, really, of immense magnitude and

11    complexity, and as we point out in our brief,

12    innumerable factors, innumerable factors, having

13    nothing at all to do with the alleged actions of the

14    defendants, could have prevented this project from

15    going forward, and certainly from being completed, and

16    beyond that, from being profitable to the point of a

17    hundred million dollars.

18            Under these circumstances, the plaintiff

19    cannot possibly satisfy Holmes.  This is not a

20    situation where you had buildings that had already been

21    constructed, or businesses that were lined up, prepared

22    to pay rents, and then there's some allegation that the

23    project was purposely scuttled.  This was a project

24    that everybody understood was in the early stages of

25    what would have been a complicated, lengthy process

1    going forward, and to assume that it would have been

2    completed on time, or completed at all, and profitable,

3    is really -- it's really just a matter of conjecture

4    and speculation, and it cannot be the basis of a RICO

5    allegation.

6          If you look -- Your Honor, the plaintiff

7    annexes to its complaint, the development agreement, as

8    an exhibit, and if you look carefully at that document,

9    which I believe is proper for you to do under a

10   12(b)(6) motion, since its annexed to the complaint,

11   the document itself, it's very clear from reviewing it,

12   that it's really a precursor to a series of additional

13   documents that all the parties anticipated would have

14   to be executed before this project would move forward.

15          The Preamble, which is on page 3 of the

16   development agreement, and I'll quote from it, says:

17          "Whereas at such time as the amount of public

18          funding has been more definitively

19          ascertained, and at such time as the parties

20          have achieved a more definite assessment of

21          the precise cost of developing the project,

22          and of other matters related to the project,

23          this agreement shall be amended and restated,

24          and the parties shall execute a plan

25          disposition agreement."

1          So, right up front, there is a recognition

2    that this is a agreement to cover the planning stages.

3          THE COURT:  Is it your understanding that if

4    the plaintiff determined that the project was too

5    expensive, they would have the right to simply say,

6    "We're withdrawing"?

7          MR. GILBERT:  Yes, and I believe that there

8    is a specific reference in the development agreement.

9    In fact, it's article 6.C.2., and I can quote from that

10   one, which says that in the event the developer decides

11   -- "In the event the developer/plaintiff decides to

12   proceed with the project," and then provides certain

13   further steps for the developer to take, but it's clear

14   that in -- the agreement itself anticipates that the

15   developer may decide not to go forward, and there's a

16   termination clause in the agreement, that provides that

17   the sole remedy for -- in the event of termination, is

18   that the agreement itself will be nullified.

19         But -- So the development agreement

20   anticipates that there's going to be a whole series of

21   future agreements that will need to be executed before

22   the project can get off the ground, and one of them is

23   this restated development agreement.

24         There's no allegation in the complaint that

25   the development agreement was ever restated.  There's

1    no allegation in the complaint that the land
2    disposition agreement, which is anticipated to be part
3    of this project, and part of the moving forward of the
4    project, was ever executed.
5            So, you have a precursor agreement that
6    anticipates that there's going to be a series of other
7    agreements, and there's no allegation that we ever
8    reached the point that those agreements were even
9    negotiated, never mind executed.
10           And the second amendment to the development
11   agreement, the agreement itself, putting aside that we
12   never got to the point of completing these later
13   agreements, the development agreement itself, which was
14   executed, is replete with contingencies.
15           It was amended, the second amendment, and
16   I'll quote some of the language from that.
17           It says:
18           "All rights and obligations of the parties
19               are expressly contingent upon, one, the
20               party's ability to obtain full authorization
21               from all necessary corporate, legislative, or
22               regulatory bodies for the execution of the
23               restated agreement, the city land disposition
24               agreement, the port authority land
25               disposition agreement, the United

1              illuminating purchase and sale agreement for

2              parcel one, the master maintenance and

3              operations agreement, and all other necessary

4              documents."

5          And again, there's no allegation that any of

6    those documents were ever executed.

7          The -- Also looking at that second

8    amendment, it's clear that another document that was

9    anticipated as part of this project, was something

10   called a "Commitment" from the developer, and not only

11   was the commitment never executed, based on the

12   allegations in the complaint, it appears that it just

13   never advanced to that stage, but the second amendment

14   to the development agreement extended the time for the

15   developer to provide the agreement, and I'll quote from

16   that.

17         It says, "The developer is not prepared to

18   issue its commitment, and has requested the extension

19   until June 1st of 1999," which moved it, I believe,

20   from March, and that document -- that clause in the

21   second amendment also specifically states that the City

22   -- acknowledges that the City of Bridgeport has

23   performed all of its obligations under the agreement.

24         Now, the termination provision, and I

25   believe that there was an original termination

1    agreement in the development agreement proper, and then

2    it was altered in one of the two amendments, but if you

3    look at the second amendment, it provides that:

4              "Upon termination, the developer will have no

5              further right, title, or any vested interest,

6              in any way."

7              So, all of these references that are found in

8    the documents that the plaintiff has attached to its

9    complaint, show that this project was in its early

10   stages, it was a proposal, and throughout the entire

11   time period of the complaint, you know, the parties

12   understood from the outset that there are many

13   contingencies, and many eventualities that might not

14   allow the project to move forward.

15             THE COURT:  When this Agreement was entered

16   into, did the plaintiff put up any money?

17             MR. GILBERT:  There's no allegation to that

18   affect, Your Honor, in the complaint, and beyond the

19   allegation in the complaint, I -- frankly, I just don't

20   know the answer to it, but there certainly is no

21   allegation in the complaint, and, you know, --

22             THE COURT:  Would that make a difference, do

23   you think?

24             MR. GILBERT:  Well, I think for purposes of a

25   motion to dismiss, obviously if it's not in the

1    complaint, it's not in the complaint, and to speculate

2    about it, I don't know.

3           There is an allegation that the plaintiff

4    expended -- you know, there were out of pocket expenses

5    that the plaintiff put in during the development phase

6    and, you know, I -- the -- they're not enumerated,

7    but --

8           THE COURT:  Okay.

9           MR. GILBERT:  -- I think that at the end of

10   the day it was anticipated in the beginning, by

11   everybody, that it might well be that the plaintiff

12   would expend funds in the planning stages, and then the

13   project would not ultimately be built.  So I can't

14   imagine how the plaintiff could satisfy the proximate

15   causation requirement, even as to the out-of-pocket

16   expenses.

17          And in our brief, Your Honor, we cite a 2001

18   second circuit case called "Defalco," and it has -- it

19   has a relatively similar set of facts, and the Court

20   held there, that the plaintiff had not satisfied the

21   proximate causation requirement.

22          The plaintiff in Defalco, without getting

23   into all of the details of the case, but essentially,

24   the plaintiff there claimed that there -- that a RICO

25   enterprise, made up of members of municipal government

1  and others, threatened not to continue granting

2  building permits to the plaintiff, which was a real

3  estate developer, unless the plaintiff gave a piece of

4  a deal, basically, to the defendants.

5          In Defalco, the construction -- the project

6  had already been going on, and Phase I of the project

7  had already been completed.  It is a multi-phase

8  project, and I'll quote from the district court

9  opinion, which is 978 F.Supp. 499, says:

10          "Common experience teaches that real estate

11          developments are inherently speculative and

12          that myriad factors, foreseen and unforeseen,

13          can frustrate their completion."

14          And the second circuit, which affirmed the

15  district court, said:

16          "The plaintiff's mere belief that the

17          plaintiff would have completed the project,

18          were it not for the defendant's actions, is

19          not sufficient."

20          And that's very similar to the situation we

21  have here.

22          Now, we recognize in the brief, and just to

23  be clear, that Defalco was decided on post-trial

24  motions.

25          THE COURT:  But is that the case  --  Judge

1    Parker's case?

2            MR. GILBERT:  That's right, Your honor.

3            But again, you had a situation there, where

4    you had an actual construction project underway, and it

5    wasn't -- you didn't just have a precursor agreement

6    for the planning stages, like we have here, you had

7    actual construction, and where -- as in this case,

8    where you're not even really -- you're nowhere near

9    even starting.  There's just simply no way that the

10   plaintiff can satisfy Holmes, and no amount of

11   discovery, based on the allegations in the complaint,

12   can change that.

13           In its response papers, on the proximate

14   causation argument, the plaintiff argues that because

15   it can be deemed a direct target of racketeering, that

16   somehow that exempts it from satisfying the proximate

17   causation test, and establishing that the nexus between

18   the alleged misconduct and the harm, and that simply is

19   just -- it's not the case.

20           There's a line of cases that holds that being

21   a direct target under the RICO case law is a

22   prerequisite, but cases do not hold that it's

23   sufficient simply to show you're a direct target, and

24   the Defalco case, which I was just discussing, proves

25   that point, because there you have the, just like you

1    have here, a plaintiff/real estate developer who claims

2    that the defendant RICO enterprise is targeting it.

3    Nevertheless, the Court held that it was unable to

4    satisfy the proximate causation requirement of Holmes.

5         So, given the preliminary nature of this

6    project, the fact that we have numerous documents that

7    were anticipated, but had never been executed, the fact

8    that we never had construction beginning, that

9    everybody understood from the beginning that this was a

10   multi-year, complex project, fraught with potential

11   pitfalls, under those circumstances, and under the

12   supreme court case in Holmes, the plaintiffs simply

13   cannot satisfy the proximate causation requirement, and

14   that is sufficient basis to dismiss the RICO

15   allegations.

16        Now, more specifically focusing on the claim

17   for $100 million in lost profit, that allegation, or

18   that claim is far too speculative to support a RICO

19   cause of action.

20        Again, you know, you have a project that --

21   it's simply a minefield, under the best of

22   circumstances, standing between the planning stage and

23   profitability, and to recover a hundred million dollars

24   in lost profits, or any lost profits, the plaintiff

25   would have to establish, at the very least, that all

1    parties involved, and as you can tell from just some of

2    the brief quotations from the development agreement,

3    there were numerous parties that would have been

4    involved, all of those parties would have had to

5    satisfy all of the contingencies in the development

6    agreement itself, and that presumably would include

7    dealing with any type of community opposition, which is

8    certainly not uncommon in a project of this size and

9    scope, along with any other political pressures that

10   might have been brought to bear.

11           The restated development agreement, they

12   would have to establish that it would have been

13   restated and executed; a land disposition agreement

14   would have been negotiated successfully, and executed,

15   as long -- as well as all of the other agreements and

16   requirements set forth in the development agreement;

17   that the developer would have been provided the

18   commitment that's referenced in the development

19   agreement; that land would have been actually

20   transferred or deeded to the plaintiff, ground would

21   have been broken on the project; the first phase of the

22   project would have been completed, the later phases

23   would have been completed.

24           The plaintiff alleges that the expenses on

25   the project would have totaled $1 billion, so

1    presumably, they would have to establish that those

2    expenditures would have been recouped, and on top of

3    that, it would've been a hundred million dollars in

4    profits.  It's sheer speculation.  Its sheer

5    speculation.

6              And as Judge McCasey stated, and this is

7    another case we cite, First Nationwide, it's a 1992

8    case -- district court case:

9              "The speculation required by these

10             allegations is not, as the plaintiff asserts,

11             simply supposition about computing damages.

12             Civil RICO damages are unrecoverable if the

13             fact of their accrual, or their amount and

14             nature are unprovable."

15             And that is exactly the situation here.

16             In its response to our argument on lost

17   profits, the plaintiff simply argues that the loss of

18   the contract, the development agreement, was

19   foreseeable, and that, therefore, it has injuries that

20   are concrete enough under RICO, but the development

21   agreement merely conferred rights on the plaintiff, to

22   be involved in the planning stages of the deal, it did

23   not entitle the plaintiff to profits.  It did not

24   necessarily even entitle the plaintiff from allegations

25   in the complaint and the attached documents, to be the

1    developer, ultimately.

2              And so, for those reasons, certainly the

3    claim for a hundred million dollars in lost profits is

4    far too speculative under the RICO case law, to support

5    a cause of action.

6              THE COURT:  Supposing the claim was that they

7    would've made a million dollars in profits, would that

8    -- I mean, is it the figure itself, or is it the

9    concept of lost profits?

10             MR. GILBERT:  It is the concept of lost

11   profits.  Even if it was one dollar, the argument would

12   be the same, that what you have to establish to get to

13   the point of a dollar of profit, would really require a

14   jury ultimately to -- just simply to speculate about

15   how all of these events would have played out over a

16   period of years, but the fact that the claim is $400

17   million simply highlights the speculative nature of

18   requesting any lost profits.

19             Turning to the specifics of the RICO

20   allegations, the predicate racketeering acts, the

21   plaintiff asserts 15 racketeering acts and, as we point

22   out in our brief, Your Honor, seven of these have

23   absolutely nothing to do with the plaintiff's business,

24   as far as we can tell from the complaint.

25             The plaintiff was not injured in its business

1   or property, for purposes of the RICO statute or for

2   any other purpose, as far as we can tell, from matters

3   such as Racketeering Act 4, which is -- relates to

4   demolition contracts; Racketeering Act 7, which relates

5   to a baseball stadium; Racketeering Act 8 relates to a

6   hockey arena.  There's no allegation the plaintiff was

7   involved in any of these transactions or any of these

8   projects, sewer lines in Racketeering Act 9;

9   engineering work on a private home, Racketeering Acts

10  10, 11; and a private zoning appeal in Racketeering Act

11  12.

12          So, those seven racketeering acts, from what

13  we can tell from our review of the complaint, have --

14  could not have possibly injured the plaintiff.

15          So that leaves eight, and two of the eight

16  alleged racketeering acts are violations of Title 18,

17  Section 666, which is the federal programs bribery

18  statute, and as we point out in our brief, and I

19  believe the plaintiff has conceded, based on its reply,

20  or its response, I should say, Section 666 is simply

21  not a RICO predicate, and so there's no basis for those

22  racketeering acts.

23          So that these six remaining racketeering

24  acts, and three of them are Hobbs Act allegations.

25  That's Racketeering Acts 2, 13, and 14, and we point

1   out in our brief, Racketeering Act 2, read on its face,

2   it just -- it doesn't make sense.  It's not -- It seems

3   like it might be a typographical error, and I don't

4   need to harp on something of that nature, but it's

5   impossible for us to determine, from that allegation,

6   what exactly it is the plaintiff is alleging.

7        The way it reads is the act -- the

8   racketeering act never completes the phrase, "In order

9   to effectuate the scheme to enrich themselves."  It

10  seems to have left out language, so it's impossible for

11  us to tell what it is that the plaintiff alleges the

12  defendant -- or, in particular, the -- Defendant Ganim

13  did, that could possibly constitute a Hobbs Act

14  violation.

15       Now, Racketeering Acts 13 and 14 are the

16  other two Hobbs Act allegations, and they're basically

17  identical allegations that take place on two separate

18  dates, and as to Joseph Ganim, the allegation is that

19  Ganim had knowledge of, and consented to Defendant

20  Kasper suggesting that in order to gain Ganim's

21  support, the plaintiffs should name a co-developer, the

22  Lenocis, as one of the co-developers on the project.

23       Well if you look -- if you read it carefully,

24  first of all, there's no allegation that -- as to

25  Ganim, that he did anything at all.  I mean, the

1    allegation, as required for a RICO predicate, has to be

2    that the defendant participated in, or at least ordered

3    or directed the act, and there's no allegation of that.

4    The allegation as simply that Ganim knew and consented

5    to another defendant making a suggestion to the

6    plaintiff.  So, as the Ganim, I -- we don't see how

7    they can possibly support a Hobbs act violation.

8          Beyond that, to the extent the plaintiff here

9    alleges that it was the victim of a Hobbs Act extortion

10   under color of official right, under the case law, the

11   plaintiff has to allege that they were -- it was placed

12   in fear, or that it was required to make a payment of

13   some kind, and there's no allegation that the plaintiff

14   here, made a payment to Ganim, or to anyone else, for

15   that matter.

16         So, whatever the suggestion, whatever legal

17   theory may apply to a suggestion to accept a co-

18   developer, from what we can see of the complaint, it

19   certainly is not the stuff of Hobbs Act extortion, and

20   it's for those reasons the Hobbs Act allegation should

21   be dismissed, and so that leaves just the --

22   Racketeering Acts 1 and 15, which are fraud

23   allegations.

24         And Racketeering Act 1, as we point out in

25   the brief, and again, this -- it appears to simply be

1    maybe a typographical error, or simply a mistake, but

2    the way it's written, Racketeering Act 1 cites only

3    Section 1346, the -- on the services provision, and

4    that is not a crime, in an of itself.  It may not be a

5    constitutional statute.  I believe that's up in front

6    of the second circuit, but certainly standing alone,

7    the statute simply reads -- simply defines what may be

8    a violation of either the mail or wire fraud statutes,

9    so it's insufficient simply to cite 1346.

10           But assuming that what the plaintiff has

11   intended to do is cite the mail fraud statute, it's --

12   really, it's hard to figure out because if you look

13   closely at the allegations, it enumerates certain

14   documents that presumably would support a mail fraud

15   theory, but then there are also telephone conversations

16   listed there.

17           So, it's unclear whether the plaintiff

18   intends to pursue the mail fraud or wire fraud, or

19   honest services, and for the purposes of a motion to

20   dismiss, we should not have to speculate as to that.

21           In any event, assuming that it's mail fraud,

22   and those documents are listed there, there's no

23   allegation here, that the plaintiff relied on any

24   misrepresentations or omissions -- material omissions

25   contained in any of those documents, and it's not clear

1    from the complaint itself, what some of these documents

2    are.  It lists the number of documents that are not

3    attached to the complaint.

4          The one document that's listed in the mail

5    fraud allegation that is attached to the complaint, is

6    the development agreement itself, and if you think

7    about that, it's really inconceivable that the

8    development agreement itself could have been

9    transmitted in, I believe it's December of 1997, which

10   is the allegation in the racketeering act, that it

11   could have been transmitted in furtherance of the

12   scheme to defraud the plaintiff, because at that point

13   it was -- the only conceivable purpose of transmitting

14   the development agreement to the plaintiff then, was to

15   enter into a relationship with the City, not to thwart

16   the plaintiff's ability to pursue that relationship, so

17   that allegation certainly doesn't specify

18   misrepresentations or omissions in the agreement, that

19   the plaintiff presumably relied on and, on its face, it

20   simply -- it doesn't really make any sense.

21          With regard to Racketeering Act 3, that's the

22   Connecticut bribery statute, and it alleges that Ganim

23   committed multiple acts involving receiving bribes, and

24   -- I mean, the problem here, other than the lack of

25   specificity with the particular count, is really, it's

1    -- the overall theory is that the plaintiff was somehow

2    subject to reasonable conditions, which the plaintiff

3    alleges throughout the course of this project, or at --

4    starting at some point during the course of this

5    project, but the plaintiff never specifies what those

6    unreasonable conditions were, other than the one

7    condition that it was asked to accept a co-developer

8    which, according to the complaint, the plaintiff

9    rejected the suggestion, but in any event, for bribery,

10   the plaintiff doesn't come close to linking a payment

11   of a thing of value to Ganim, to any specific act, or

12   any specific condition that was put upon the plaintiff

13   during the course of this proposal, and I think we

14   cited in our brief, there are number cases that say

15   that in addition to the Rule 9 requirement that fraud

16   be pled with specificity, there is a heightened

17   requirement in RICO allegations, that fraud be

18   specified, and you can certainly see, in this case, why

19   that should be.

20          So, putting aside the larger proximate

21   causation problems, the problem of the speculative

22   nature of the lost profits they seek to recover, the

23   plaintiff has not satisfied its requirement to plead to

24   racketeering acts properly, and so that's an

25   independent basis to dismiss the RICO counts, Counts

1    One and Two.

2            Turning to the Section 1983 allegation,

3    Section 1983, plaintiff has to show it was deprived of

4    a constitutional right under color of state law.

5            In the complaint, the plaintiff makes a very

6    broad statement that it was deprived of its right to

7    property without due process, but the plaintiff never

8    identifies, in the complaint, what property right it

9    was supposedly deprived of.

10           In its response papers, the plaintiff

11   asserts, and I'll quote from it, it says:

12               "The mutually explicit understanding that the

13               development agreement would be continued."

14           So it appears that there's some, maybe

15   combination of a theory that it was the development

16   agreement itself, or some understanding outside of the

17   development agreement, that the plaintiff asserts is

18   the property interest that it had, and under the case

19   law, this is no doubt -- this simply does not rise to

20   the level of a constitutionally-protected property

21   interest.  The development agreement itself doesn't

22   give rise to a property interest because of its -- all

23   of the conditions in it.  It does not -- I think the

24   phrase in the case law is, "The concreteness of

25   entitlement," and it's not there.

1           We cite a number of cases that -- for the

2    proposition that all contracts, simply because you have

3    a contract with a municipality, does not create a

4    property interest for purposes of the Constitution.

5    You may have a breach of contract case, and many of the

6    courts have noted that one of the problems under RICO

7    is that very often, what should be -- when it's truly a

8    breach contract, becomes elevated to a RICO allegation,

9    but for purposes of 1983, as well, the courts have held

10   that not every commercial contract to which a

11   government is a party, creates a property interest, for

12   purposes of 1983.  You need to show a concreteness, a

13   level of entitlement, and the case -- one of the cases

14   that had similar facts that we cited, a second circuit

15   case from 1988, Valentis, which also involved a real

16   estate developer who had been granted conditional

17   rights on a  real estate project, also where later

18   agreements were anticipated, including there was a

19   reference there, to a land disposition agreement that

20   had been anticipated, but not executed, and the Court

21   held that the plaintiff did not establish that it had a

22   concreteness of entitlement under that development

23   agreement, for purposes of 1983, and dismissed it.

24           So here, where you have the development

25   agreement, again, itself replete with contingencies, a

1   project that is fraught with all sorts of potential

2   pitfalls that have nothing to do with the acts alleged

3   of the defendants, you have specific references to

4   future agreements in the development agreement, you

5   have a clause that says termination is the sole remedy.

6          So I -- under these circumstances, they're

7   just -- plaintiff cannot establish that it has a

8   property interest, for purposes of Section 1983,

9   sufficient to support that cause of action, and so both

10  Counts One and Two, the RICO allegations, should be

11  dismissed, as well as Count Three, which is the Section

12  1983 allegations.

13         As I mentioned earlier, I'm going to defer to

14  other counsel to argue the state court allegations in

15  the complaint, but certainly, as we point out in our

16  brief, if the Court determines that the federal causes

17  of action are insufficient, and dismisses them, we

18  would respectfully request the Court to exercise its

19  discretion and dismiss the state court allegations, as

20  well.

21         Thank you, Your Honor.

22         THE COURT:  Anyone else?

23         MR. HEATH:  Your Honor, how do you wish to

24  proceed on this?  Do you wish to take the RICO -- both

25  sides of the RICO argument first, and then the --

```
1              THE COURT:  Yeah.

2              Does anyone else want to add to Mr. Gilbert's

3    argument on the RICO issue?

4              MR. GRUDBERG:  Just, sir, --

5              MR. COWDERY:  I'm sorry.  Just to put on the

6    record, James Cowdery on behalf of Leonard Grimaldi and

7    Harbour Communications.

8              We join in the arguments made by fellow

9              counsel.

10             THE COURT:  All right.

11             I assume all counsel do so.

12             MR. GRUDBERG:  Good morning, Your Honor.  I

13   do too.  Ira Grudberg on behalf of the so-called

14   "Lenoci" defendants.

15             I have very little to add to Mr. Ganim's

16   counsel.

17             A number of things that -- as I read the

18   complaint, the lack of specificity creates a number of

19   problems, which I suppose are factual.  It's my

20   understanding -- Although we do not have the paperwork

21   from the City of Bridgeport, it's my understanding that

22   after having the agreement -- development agreement

23   continued, and the termination put off and put off,

24   that it, in fact, was terminated by the City of

25   Bridgeport at the end -- initially, at the end of 1999.
```

1          The allegation as to what -- As far as I can
2    see, the allegation that the Lenocis, that they offered
3    Pinto, for the mayor, allegedly, to raise half a
4    million dollars for a gubernatorial race, and pay
5    $450,000, again, there's no date in that, there's no
6    date on the termination.  It's my understanding that
7    that came a number of months after the initial
8    termination, that after that, in fact, later, in 2000,
9    the City of Bridgeport gave plaintiff another shot at
10   seeing if he could put things together.
11          Finally, and I don't know whether this is
12   part of the record, it's all over the newspapers, it is
13   now 5, 6 years afterward.  The Lenoci people never
14   really got to be a possible developer on it.  Other
15   people have taken over.  There still has not been a
16   shovel lifted in anger.  This thing begins, quite
17   clearly, to appear, especially with problems of
18   financing, from government financing and so forth, it
19   will never go, and it just seems to me it's quite clear
20   that Mayor Ganim is correct, that it's so speculative,
21   you cannot base a RICO allegation or damages on it.
22          So I have nothing further.
23          THE COURT:  All right.
24          Mr. Gallagher?
25          MR. GALLAGHER:  If it please Your Honor,

1    William Gallagher for the plaintiff.

2    (Unintelligible), Mr. Grudberg's remarks,

3    the plaintiff became the exclusive, and obtained the

4    exclusive development rights by contract, on November

5    18th, 1998, and he -- his termination was in March of

6    2001.  The -- And I think that -- And the rights that

7    were granted under that initial contract are important.

8    During that time frame, for example, the

9    property in question was condemned.  It was cleared.

10   There was site work that was done.

11   The complaint indicates that the plaintiff

12   had incurred substantial expense, in the area of $5

13   million.  Granted, the claim is for a hundred million,

14   and step back a minute, and the Court is aware that the

15   legislature -- there was an authorization for two

16   million dollars, as stated -- $200 million in State of

17   Connecticut public financing, so they granted -- there

18   were many contingencies, and in the course of this

19   trial, we would have to prove, but we ought to be able

20   to be afforded our opportunity to make that proof, and

21   this goes to the proximate causation argument that

22   counsel has raised.

23   The Holmes case, as I understand that

24   decision, the Court talks about the problems with

25   indirect injury, and apportioning damages, and

1    ascertaining and avoiding a claim for double damages,

2    and so the rule is developed that you have to be

3    directly injured, but here, the plaintiff was a direct

4    target.

5         As a matter of fact, in Count Ten, Count Ten

6    of the criminal indictment against Ganim was a

7    conspiracy on this very issue, on Steel Point, and he

8    was convicted of that.

9         So, it seems to us, Your Honor, that clearly,

10   we were a direct target, and loss of profits, where you

11   are a direct target, are permissible.  Granted, the --

12   there are a lot of problems with proof here, but we're

13   entitled to develop those, either -- through discovery

14   and by expert testimony, and what the defendants don't

15   want, is to be exposed to that trial at all.  It seems

16   to us --

17        THE COURT:  Let me ask you this, Mr.

18   Gallagher.

19        What events would have had to have occurred

20   for this project to move ahead?  What were all the

21   requirements that you had to meet?

22        MR. GALLAGHER:  Well, they're spelled out in

23   the contract that's attached to the complaint, and

24   there were a host of requirements that we would've had

25   to meet.  We were deprived of the ability to meet any

1    of these things.

2              The complaint alleges that impossible time

3    lines and time deadlines were -- and demands were made

4    upon the plaintiff, and he lost -- the plaintiff lost

5    his equity partners in this arrangement, and his -- his

6    -- the contract was terminated, but we would have to

7    prove though -- This is not a summary judgment motion.

8              The Defalco case was decided after verdict.

9    That case was fully tried, and as a matter of fact,

10   this very same motion in the Defalco case was denied by

11   the Court, so that the -- and I concede to you, up

12   front, and we do concede, that there are a host of

13   factual issues that we would've had, but these are

14   contingencies, and the existence of the subsequent

15   contingencies --

16             THE COURT:  How would you be able to prove

17   that you were going to meet the contingencies?

18             MR. GALLAGHER:  Oh, I think that we can prove

19   we -- we're --

20             THE COURT:  How?  Tell me how?

21             MR. GALLAGHER:  Well, the plaintiff has

22   developed expert testimony with respect to his ability

23   to obtain financing, had these unreasonable limitations

24   not been applied.

25             THE COURT:  Did he have commitments?

1          MR. GALLAGHER:  Well, he would have been able

2   -- He had commitments, yes.  He had the equity --

3   equitable partners, he had commitments, but the demands

4   became so unreasonable.

5          I mean, there's a -- and to go outside the

6   evidence, which we would produce, for example, in a

7   motion for summary judgment, there is a telephone

8   conversation, and Lenoci indicates that that he talked

9   to the mayor and told Pinto that they were gonna come

10  in on the deal, and they were going to get rid of

11  Conroy and the plaintiff corporation.

12         So that, you know, all of these things come

13  in and come together.  We -- At this stage, I concede

14  to you that we may have a problem with you on summary

15  judgment here, but at this stage, on testing whether we

16  have asserted a cause of action that is viable and can

17  pass the--

18         THE COURT:  But my problem, Mr. Gallagher, is

19  how would you be able to prove that you would be able

20  to satisfy all of the requirements at every step of

21  these proceedings, that you'd get every permit, you'd

22  get every loan, you'd get every equity partner, you'd

23  overcome every organized opposition, you'd win every

24  lawsuit that might be filed to block you along the way?

25  How would you be able to prove that?

1           MR. GALLAGHER:  Well, the -- we've been

2    denied the opportunity to even embark on that activity,

3    and that itself is actionable.

4           THE COURT:  But isn't that the very nature of

5    speculation?

6           MR. GALLAGHER:  No, it isn't.  I mean, we

7    have an exclusive right to develop.  We spent $5

8    million in exercising that exclusive right, which was

9    taken away as a result of the misconduct of the

10   defendants.

11          Now, as -- I concede to you that each one of

12   those things becomes important.  We have answers to

13   each one, but that's on a motion for summary judgment,

14   and the evidence here, the question is -- our loss of

15   profits were clearly a direct target of their activity,

16   and loss of profits are permitted in a RICO action.

17          So, it -- it's not an illusory contract, Your

18   Honor.

19          THE COURT:  What were your profits?

20          MR. GALLAGHER:  I beg your pardon?

21          THE COURT:  What were your profits?

22          MR. GALLAGHER:  Well, the claim is that the

23   profits would have been ten percent of the total cost

24   of the project.

25          THE COURT:  How do you arrive at that?

1          MR. GALLAGHER:  Well, because the total cost

2    of the project was estimated at a billion dollars, and

3    the estimated profits are ten percent of that, a

4    hundred million.  That's the allegation.

5          Now, that's the allegation.  We're entitled

6    to make that allegation.  We may not be able to prove

7    it, and we may not even be able to get beyond summary

8    judgment on those issues, but at least we have the

9    opportunity to do that.

10          THE COURT:  Is that a commonly-accepted

11    standard in the real estate industry, that your profit

12    is ten percent of what your expenses are?

13          MR. GALLAGHER:  The -- And I can't answer

14    that question.  I don't know, in the real estate

15    industry.

16          In the development -- In the area of major

17          development like this, the margin of profit

18          can be substantially greater.

19          THE COURT:  But that assumes that you're

20    going to lease up every vacant space, that you're going

21    to lease it up at going rates, that you won't have any

22    vacancies, that you won't have any problems along the

23    way, --

24          MR. GALLAGHER:  Well, these projections --

25          THE COURT:  -- that there might be a business

1    recession which would cause you to be unable to fill

2    this space, --

3              MR. GALLAGHER:  Well, how do those --

4              THE COURT:  -- or that lenders might

5    withdraw.

6              I mean, there's just so much that could --

7              MR. GALLAGHER:  But how does that differ?

8    How does that differ?  If you have a quadriplegic

9    plaintiff who has a life care plan of hospitalization,

10   and psychiatric and medical care, I mean, he -- the

11   person may die, the doctor -- he may not need

12   psychiatric treatment, he may not need hospitalization

13   on a regular basis.  That doesn't render it non-

14   compensable, and here, the fact that there are all

15   those issues doesn't mean that Alex Conroy doesn't have

16   a cause of action for his lost profit.

17             Now, the question of what the lost profit may

18   consist of is -- I concede to you, and you've raised,

19   the issues of what has to develop here.  It's not a

20   simple case, and it would take some time to develop,

21   but that's the best we can do, Your Honor, under the

22   circumstances.  I can't be more specific on that issue.

23             The -- I'd just point out the Defalco case

24   was a case that is interesting reading because it

25   decided in favor of the defendant, after the fact, and

1    the very motion, the motion to dismiss for those very

2    reasons, that the plaintiff wasn't going to be able to

3    sustain his burden of proof, was denied up front, and

4    we have -- we know that we have $5 million in losses

5    here, Your Honor, as a result of this loss of contact,

6    and the loss of the exclusive development rights, and

7    we believe that we can prove substantially more than

8    that, and we ought to be given the opportunity to do

9    so.

10          The many contingencies that have been raised

11   are no different than the example I gave you, and those

12   contingencies, and what the law permits projected

13   future economic losses to be in a catastrophic injury

14   case, and granted, there are many of those things that

15   we're going to have to project on, it's going to be the

16   subject of some controversy and expert opinion --

17          THE COURT:  There was an issue raised, I

18   think it was in the defendant's brief, about concrete

19   financial loss, that you have to allege concrete

20   financial loss, and then -- And what you said in

21   response was that your concrete financial loss were

22   your lost profits, or potential lost profits.

23          MR. GALLAGHER:  Potential lost profits.

24          THE COURT:  So, how can concrete financial

25   loss equate to potential lost profits?  Concrete

1   financial loss, at least it seems to me, to be money

2   that's out of your pocket --

3           MR. GALLAGHER:  And we do -- There are

4   allegations that we've lost $5 million.  That's

5   concrete.

6           THE COURT:  All right.

7           That -- So that's your concrete loss, not

8   your potential lost profits?

9           MR. GALLAGHER:  Well, the -- yes, I'm not

10  retreating from the claim that we do have that

11  allegation, but I'm not retreating from the claim that

12  potential lost profits here, are certainly an issue,

13  and that the -- so long as we're the direct victim

14  here, and we clearly are, it seems to us that potential

15  of lost profits, subject to being developed on

16  discovery, we have concrete direct potential lost

17  profits.

18          We have -- We know we have $5 million in

19  losses.  We may have substantially more by way of lost

20  profits.

21          So, I think we can survive the motion to

22  dismiss on that basis, and then the claim -- Your

23  Honor, their claim of speculative damages is that --

24  it's the same argument that I have to give you, is that

25  it's a question of fact, is that the key here is that

1    there are no independent intervening causes.  In the

2    cases they cite, there are a host of subsequent

3    developments and -- that are -- become intervening

4    causes, and until you develop the evidence and these --

5    in these subsequent events, and how -- what was more

6    likely than not, which is the standard, and whether we

7    could have surmounted those, I don't think we should be

8    deprived of asserting the cause of action, and seeing

9    what the evidence develops.  I --

10            THE COURT:  I asked Mr. Gilbert whether or

11   not the plaintiff could have withdrawn from this

12   agreement at any point, and he said that in his opinion

13   they could have.

14            Do you agree with that?

15            MR. GALLAGHER:  No, I don't agree with that,

16   Your Honor.  The plaintiff could not just walk away

17   from this thing, and not -- after having spent months

18   preparing, and getting the contract from the City, the

19   plaintiffs had -- and certainly implied constructive

20   conditions of exchange to use good faith in completing

21   his responsibilities.

22            There were provisions in there, and indeed,

23   the town -- the City did terminate this contract in

24   March of 1991 for other reasons, but there were reasons

25   which would have rendered it impossible for the

1    plaintiff to perform, but he didn't exercise any of

2    those.  So it's not an illusory contract where that is

3    -- either one can walk away from it.

4         The cases they cite are employment contracts,

5    where the -- either party could terminate at will.

6    This is not that kind of a case at all.  He can't just

7    walk away from this responsibility.  Had he done so,

8    there would've been a lawsuit by the City of Bridgeport

9    against him, for its delay in time, among other things,

10   and don't forget, they started and they condemned the

11   property, and they cleared it with a view towards going

12   on with this development which, according to the

13   evidence that developed in a criminal trial, there was

14   no subsequent contract in this case, because that

15   proved too hot to deal with any further.

16        The -- Your Honor, the predicate acts

17   argument that counsel raised, if I can call Your

18   Honor's attention to -- the -- first, it's paragraph --

19   it's on page -- I'm sorry to say I've got an amended

20   complaint with me, but it's Predicate Act 15, paragraph

21   95:

22             "The defendants, who were public officials,"

23             I'm reading now, "sophisticated developers,

24             real estate attorney, architects, engineers,

25             knew that the delays, impossible demands and

1          arbitrary and capricious conditions they were

2          imposing, would force the plaintiff to lose

3          financial backers, allowing the Lenocis

4          individually, and/or companies, limited

5          partnerships or other entities controlled by

6          the Lenoci family, to take project."

7     Now, we -- we've been able to -- we were only

8  able, at the beginning, to alleged these things in

9  broad, general form, but I think that that's

10 sufficient.  A complaint should be interpreted to

11 construe not only what it says, but what it reasonably

12 implies here, and I think that we've set up allegations

13 that are sufficient causation, connected to the

14 predicate acts in this case, to set out a cause of

15 action that survives this motion to dismiss.

16     The -- I -- You know, rather than -- We've

17 briefed these issues, and rather than go into each one

18 of them, if I can rely on the brief and save some time,

19 Your Honor.

20     The civil rights argument is that we have  --

21 and that's addressed on page 13 of 15 of my brief, and

22 the key to the argument here, is that the -- we have a

23 -- the question is whether we have a legitimate

24 entitlement to a claim, and the case law reflects that

25 a person (phonetic) interest in the benefit is a

```
 1      property interest for due process purposes, if there
 2      are such rules or mutually explicit understandings that
 3      support his claim of entitlement to the benefits, so
 4      that he can invoke the appropriate procedural
 5      protections.
 6              We submit that the existence of the contract
 7      that was signed in November of 1997 or '98, was
 8      sufficient to give him exclusive development rights, at
 9      least at that stage.  That gave him -- He was the
10      exclusive developer, and granted, he had a lot to do to
11      comply, and neither party had a right to terminate that
12      at will, and it seems to us that he was entitled --
13      that gave him an entitlement to the benefits of that
14      bargain, and that's sufficient under a 1983, the state
15      of the civil rights claim, and that's our argument on
16      that.
17              The --
18              THE COURT:  Well, what property interest did
19      he have?
20              MR. GALLAGHER:  Well, he had a property
21      interest in the -- He had an exclusive development
22      right, which is a property interest, it seems to us,
23      and they took it away, his entitlement under that
24      exclusive development right to future contracts, as
25      they came up, and to have that not interfered with in
```

1    the manner that it was.

2         I mean, that's all he has.  He has a

3    contract, as the exclusive developer, and it would seem

4    to us that what the defendants are really saying is,

5    "That's not enough because these developments are so

6    complex and take so much time, that if that's all you

7    got, when we take it away from you, it's okay, you

8    don't have the RICO claim."  A RICO claim in

9    circumstances where a jury --

10        THE COURT:  No, it's a 1983 claim.

11        MR. GALLAGHER:  Excuse me, a 1983 claim, but

12   they're based -- their argument is essentially the same

13   on the RICO claim, is that -- and that's the 1983

14   issue, is that he had the exclusive development right.

15   That's all he had under that contract.  By the time it

16   was taken away, he had spent a fortune -- a small

17   fortune.  He had obtained public funding to the tune of

18   $200 million.  The property was cleared.  It was

19   condemned.  The matter was going on until it was

20   decided that the cronies would take over, and the

21   contract would be -- and this is the claim now, that

22   the contract would be steered to the Lenocis, as a

23   result of the imposing impossible deadlines, and make

24   it impossible for Conroy to comply.

25        He has a right, it seems to us, both under a

1    1983 and the RICO statute, to attempt to prove his

2    claims, and it may well be that, as a matter of fact,

3    he will have some trouble on the causation issue, but

4    it seems to us, as a matter of law, which we're talking

5    about here, he has a viable cause of action for RICO,

6    which is sufficiently alleged, and he has a viable

7    cause of action for the 1983 claim because it's his

8    entitlement to the exclusive development right, and

9    through that, to the future contracts that were

10   afforded under that contract.

11          THE COURT:  What about the predicate acts?

12          MR. GALLAGHER:  The predicate acts, Your

13   Honor, it seems to us that we've -- I've mentioned the

14   -- In paragraph 15, the allegation that the defendants

15   -- who they were, and their role, and the specific

16   activities.

17          We -- The -- You know, there are some parts

18   of the complaint that could be clearer.  I'm not

19   suggesting that there's not some issue with respect to

20   some of those predicate acts, but the fact is that all

21   of the parties who are alleged in these predicate acts,

22   were parties that Ganim -- or that was intended to

23   become part --

24          THE COURT:  Well, let's take the claim of Mr.

25   Gilbert.  He said of the -- There are 15 predicate

```
1    acts.  Seven of them have nothing to do with your
2    client.
3              MR. GALLAGHER:  Well, those seven have to do
4    with personnel who would become involved with our
5    client.  All of those individuals were personnel who
6    had a role in, or wouldn't plan to have a role in
7    either the termination of --
8              THE COURT:  Well, how do we know that?
9              MR. GALLAGHER:  I beg your pardon?
10             THE COURT:  How do we know that?
11             MR. GALLAGHER:  Well, that's the allegation.
12   I mean, that's the claim.
13             THE COURT:  You mean you can allege seven
14   predicate acts involving the baseball stadium, or the
15   hockey arena or -- that have absolutely nothing to do
16   with your client, but your claim is that they do apply
17   because ultimately the Lenocis would have taken over,
18   so therefore it's okay?
19             MR. GALLAGHER:  Well, that's the claim, Your
20   Honor.  The individual -- The personnel in those
21   predicate acts are all related to the development of
22   this Steel Point project.
23             THE COURT:  What about the 666 acts, which
24   can't be predicate acts to RICO?
25             MR. GALLAGHER:  The -- I'm going to tell you,
```

1    Your Honor, I don't have an answer to that.  I've

2    looked at that very carefully, and I can't answer that

3    question.

4        (Pause.)

5            MR. GALLAGHER:  I can tell you, with respect

6    to the extortion, the wire tap, and the predicate acts

7    in 2, 13 and 14, the -- we've alleged, and you can

8    discern from those, the primary contract, the role of

9    the parties as primary actors, or as aiders and

10   abettors, and the manner of the primary contact, and

11   that -- and conduct, and that's all we have to allege.

12   Persons, dates, and methods of extortion, these things

13   have been alleged.  Same with persons, dates, and if

14   you look at the allegations, there are all kinds of

15   specificity on page 42, in paragraphs 96 of the

16   complaint.  I mean, there's a --

17            THE COURT:  Well, --

18            MR. GALLAGHER:  -- an enormous amount of

19   specificity.

20            THE COURT:  Look at those -- Predicate Acts

21   2, 13 and 14, the so-called "Hobbs Act" claims.

22        Mr. Gilbert had said that it didn't make

23   sense because it doesn't really tell you what the claim

24   is, and I'm reading it, I'm looking at it, say,

25   Racketeering Act 2 says:

1            "Between 1997 and 2000, in the State of

2            Connecticut and elsewhere, the defendants,"

3            it lists all the defendants, "did unlawfully

4            obstruct, delay and affect commerce by

5            extortion, as that term is defined in 18-

6            1951(b)(2), in that, in order to effectuate

7            the scheme to enrich themselves at the

8            expense of the plaintiff by wrongful use of

9            actual economic harm under color of official

10           right and" --

11           What does that mean?  I don't understand

12  that.

13           MR. GALLAGHER:  Well, we've incorporated

14  paragraphs 1 to 19, and 22 to 46 of the -- in this

15  allegation, and read -- As a whole, it alleges --

16           THE COURT:  It seems to me there's something

17  missing there.

18              What's -- What was the scheme?

19           MR. GALLAGHER:  Well, it alleges that Ganim

20  committed multiple acts involving receiving bribes.

21  He's agreed to accept benefits from Grimaldi, Harbour

22  Communications, Pinto, Kasper, Kasper group, Lenoci,

23  Schinella, United Properties, other properties, the

24  Lafayette Center.

25           THE COURT:  Where does it say that?  Does it

1    say that in the allegation, Racketeering Act Two?

2             MR. GALLAGHER:  Yes.  I'm reading from

3    paragraph -- You know, there is a couple of amended

4    complaints, Your Honor.  I'm reading from page 27,

5    paragraph 58, of -- excuse me, Racketeering Act 3, I

6    was reading from.

7             Paragraph 2, it alleges that they unlawfully

8    obstructed, delayed, and affected the commerce by

9    extortion, and that in order to effectuate the scheme

10   to enrich themselves at the expense of the plaintiff,

11   by wrongful use of actual economic harm under the color

12   of official -- under 18 --

13            THE COURT:  What does it mean, "By wrongful

14   use of actual economic harm"?  What does that mean?

15            MR. GALLAGHER:  Well, the allegations that

16   are set out in the paragraphs that are incorporated,

17   through paragraph 54, would set out the conspiracy to

18   take over the project, and do the plaintiff out of his

19   -- Harbour Place -- Bridgeport Harbour Place out of

20   their agreement.

21            That's what this case is all about.  That's

22   the -- You know, you have to read what it says, what

23   reasonable implications there are, and those are the

24   allegations in 1 through 46, which are incorporated

25   into this Racketeering Act Number 2, and the

1    allegations, Your Honor, so long as we can show that

2    allegations are sufficient to show that the method of

3    conduct, the approximate dates, we don't have exact

4    dates, we do now, as to the trial, but we didn't when

5    we drafted this, and the nature of the activity, the

6    wire taps, the threats of extortion, these things are

7    all alleged, and it seems to us that it does make sense

8    and that you can -- on a permissible view of the

9    complaint, you can read, this says creating sufficient

10   specificity to create a cause of action under that

11   statute.

12            THE COURT:  Thank you, Mr. Gallagher.

13            Any response, Mr. Gilbert?

14            MR. GILBERT:  Very briefly, Your Honor.

15            I'll just address briefly, Your Honor, the

16   arguments about the out-of-pocket money, the $5 million

17   that the plaintiff alleges it should be entitled to

18   recover under RICO, and I would just note again, as I

19   think I did in my opening argument, that the --

20   everybody understood going into this, that it was

21   perfectly possible that money would be expended in the

22   planning stages of a project that would not ultimately

23   be developed, and so there would be no remedy under the

24   contract, I don't believe, for the plaintiff to

25   recover, simply because after expending funds toward

1    planning, ultimately a decision was made, for whatever

2    reason, and there were certainly enough possibilities,

3    that the project was not gonna go forward.

4             With regard to the civil rights allegation,

5    the 1983 allegation, whatever the contract -- whatever

6    rights the contract may or may not provide to the

7    plaintiff, the question for 1983 is whether those

8    rights rise to a constitutionally protected property

9    right.  If there's some claim of breach of contract

10    that perhaps, as I mentioned before, could be addressed

11    in a state court breach of contract allegation, or any

12    court, that's one thing, but what we're talking about

13    here, is an allegation that would have to arise to a

14    constitutionally protected property right, and there

15    are many cases that say, "Sure, you have a contract

16    with the government, but that doesn't necessarily mean

17    that any dispute under the contract gives you a federal

18    cause of action under Section 1983," and I think that's

19    exactly what we have here.  We have a situation where

20    despite the, you know, and initial agreement here,

21    that's not sufficient to give rise to a 1983 action.

22             So for the reasons I -- we put forth in our

23    brief, and the reasons I mentioned earlier, we

24    respectfully request the Court dismiss Counts One, Two

25    and Three of the complaint.

1          MR. GALLAGHER:  Can a I correct one item I

2     didn't mention, Your Honor?

3          THE COURT:  Sure.

4          MR. GALLAGHER:  I had mentioned a couple of

5     times, that the contract was terminated in 1991.  I

6     didn't realize I said it.  I don't know if you gave

7     it --

8          THE COURT:  I thought you said "2001."

9          MR. GALLAGHER:  Oh, 2001.

10         May I make one other observation that -- and

11    -- that's been called to my attention by counsel, and I

12    think Your Honor can take judicial notice of this, that

13    there were proceedings before the Connecticut Bonding

14    Commission with respect to the 200,000 -- 200 million,

15    and the City hired a consultant, Bothlett, Chickland

16    Company to review the project, and assess its

17    viability, and verify its potential profitability, and

18    the City signed onto it, and that was instrumental in

19    getting the bonding committed by the state bonding

20    commission.

21         Now, this is a matter that's outside the

22    complaint, I concede to you, but certainly a matter of

23    proof that we would have concerning the many

24    speculative issues, or the many issues that were

25    claimed speculative, the contingencies that you had

1  mentioned, that these -- There are -- There is plenty

2  of evidence out there, and all we seek by this

3  proceeding, is an opportunity to develop and ventilate

4  it here in the summary judgment proceeding.

5      MR. GILBERT:  Your Honor, I'm sorry, just

6  very briefly.

7      While we're on the subject of matters outside

8  of the complaint, then I would just note for the Court

9  that it's my understanding that the plaintiff made an

10  application to the district court judge presiding over

11  the criminal prosecution of my client, to be deemed a

12  victim, for purposes of the restitution statute, and

13  it's my understanding that the motion was denied.  So I

14  would add that to the matters not a strictly in front

15  of the Court.

16      THE COURT:  All right.

17      MR. GRUDBERG:  Very briefly, if the Court

18  please.

19      I indicated earlier that I did not have the

20  papers, we've been unable to get material from the City

21  of Bridgeport because the -- apparently because they're

22  -- they made claims for restitution against the

23  Lenocis.  It was my understanding that initially they

24  was terminated at the end of 1999, the first of 2000,

25  and then I said later, they offered them again.

1          They thought that in March of 2001, that

2     supposedly plaintiff was terminated in order to have

3     the Lenocis take over this deal, initially, they said,

4     by 2000, halfway through 2000, when the word was out

5     that there had been wiretaps, or there been bugs where

6     they're eating breakfast.  Everybody was hit with

7     subpoenas and search warrants.

8          It's just inconceivable, I mean, by the

9     spring of 2001 there were not quite formal criminal

10    proceedings pending, but everybody was in the soup at

11    that point, the Lenocis, and there's no way that in

12    2001, any allegation can rationally be made that

13    whoever it was at the City did this, did that so that

14    the Lenocis could take over.  They did not.  They have

15    not.  There's no way they could have.

16          THE COURT:  Anyone else?

17          MR. SKLAIRE:  Your Honor, I just want to

18    correct, with respect to Mr. Gilbert's last comments

19    with respect to the criminal proceedings, which I was

20    directly responsible for.

21          We were asked by the probation department to

22    submit a position statement with respect to

23    restitution.  There was never a formal motion filed,

24    and neither was there ever one denied.

25          What the Court did, as I read in the

```
 1            newspaper, was to defer any ruling with
 2            respect to claims for restitution filed by
 3            either Bridgeport Harbour or the City.  The
 4            government's position was that the matters
 5            properly belonged in this case, in the civil
 6            case, Your Honor.
 7            THE COURT:  All right.
 8            Anyone else?
 9        (No audible response.)
10            THE COURT:  You want to be heard on the state
11  law claims?
12            MR. BELT:  Very briefly, Your Honor.
13            Attorney David Belt, Your Honor.  I represent
14  what's being referred to as the "Lenoci defendants."
15            And very briefly, Your Honor, we have, in
16  addition to joining in the motion to strike the first
17  three counts of the complaint that Mr. Gilbert argued,
18  have also filed a motion to strike two of the state
19  court claims.
20            THE COURT:  To strike or dismiss?
21            MR. BELT:  I'm sorry, to dismiss.  I'm sorry,
22  Your Honor is quite right.
23            The -- Counts Seven, which is a count under
24  the Connecticut Unfair Trade Practices Act; and Count
25  Eight, which is a Connecticut state law statutory theft
```

1    count, these two have actually some similarities

2    because they depend on the sufficiency of allegations

3    to allege facts which satisfy a statutory prerequisite

4    in order to bring both of those claims.

5          To take the Unfair Trade Practices Act claim

6    first, there's no question, and the plaintiff has

7    conceded, that in order to violate the Connecticut

8    Unfair Trade Practices Act, the acts complained of have

9    to have been in the conduct of trade or commerce.

10         Now, "trade or commerce" is not just a vague

11   general term.  "Trade or commerce," under the

12   Connecticut Unfair Trade Practices Act, is a defined

13   term, and a statutory definition of what "trade or

14   commerce" means, is things like advertising, sale,

15   lease, granting of property, and that sort of thing.

16         It -- The statute does not say that in order

17   for there to be a violation, the acts have to be

18   somehow associated with, or somehow concerned with, or

19   somehow related to.  The statute says that in order for

20   there to be a violation, the acts complained of have to

21   be in the conduct of trade or commerce, which is the

22   defined term.

23         With respect to a number of the defendants,

24   there isn't even a passing reference to the kind of

25   business that they're even engaged in, much less the

1   kind of allegation that satisfy this requirement that

2   the acts complained of have to have been in the conduct

3   of trade or commerce.

4           Even with respect to those defendants, where

5   there's some reference to the kind of business that

6   they conduct, or were involved in, the plaintiff

7   concedes, in its responsive brief, that the majority of

8   cases, including cases decided by this Court, have held

9   that in order to satisfy this requirement, the conduct

10  must have been in the defendant's primary trade or

11  commerce.  This is not enough, that it be --

12  technically satisfy the statutory definition, but it

13  has to do that and, in addition, has to be in the

14  defendant's primary trade or commerce.

15          There's no allegation with respect to the --

16  any of the defendants here, that the acts complained of

17  were in the conduct of their primary trade or commerce

18  and, under those circumstances, the Unfair Trade

19  Practices Act allegation is just fatally defective.  It

20  hasn't alleged something that has to be alleged in

21  order to satisfy the statutory requirements.

22          Similar situation comes up with respect to

23  statutory theft.  There's no question, and the

24  plaintiff has conceded, that in order for there to be a

25  statutory theft, there has to be theft of property.

1    "Property" is a statutory-defined term in the

2    Connecticut General Statutes.

3              There's also no question here, and I think,

4    as plaintiff concedes in their responsive brief, that

5    what is alleged to have been stolen is developmental

6    rights, or rights under a contract.  These are

7    intangible rights.

8              There's nothing in the statutory definition

9    of "property" in the Connecticut General Statutes, that

10   makes intangible property, property for purposes of

11   that statute.

12             There are three cases that have been decided,

13   interpreting that language in the Connecticut statute,

14   two state court cases and one decision by this court.

15   They all agree that intangible property rights do not

16   constitute property, for purposes of the Connecticut

17   statutory theft statutes, and plaintiff cites no case

18   that holds or even suggests otherwise.

19             So, because of their failure to allege that

20   it was property, tangible property, that was stolen,

21   they have not satisfied the statutory requirement, and

22   cannot bring, therefore, a statutory theft action, as

23   alleged in Count Eight.

24             Now, Your Honor, just to turn very briefly to

25   the RICO counts.  Unlike the motion that Mr. Gilbert

 1    argued, which was a motion to dismiss, we have also

 2    asked that in the event that Your Honor -- we, of

 3    course, join in that motion, and feel that the --

 4    believe that the complaint does not adequately allege

 5    RICO actions, but should Your Honor determine

 6    otherwise, we think that the plaintiff should clearly

 7    be required to comply with the standing order in RICO

 8    cases.

 9            There is absolutely no question here, that

10    the -- neither the complaint nor the RICO case order

11    compliance complies with the standing order.  The

12    standing order requires detailed information concerning

13    each defendant, concerning specific dates that specific

14    things happened.

15            A typical allegation, both in the complaint

16    and in the RICO case order compliance statement, is

17    that a group of seven or eight defendants, over a

18    period of three of four years, engaged in a generally-

19    described act.  There's no specifics.

20            I think in one case they list a list of 20 or

21    30 individual communications that they allege have to

22    do with mail or wire fraud, I think, allegations.

23    Interestingly, none of those involved communications

24    involving the defendants that I represent.

25            Almost --

1          THE COURT:  Are you suggesting, Mr. Belt,

2    that it's premature to address the motions to dismiss,

3    until such time as they comply with the standing order

4    on RICO?

5          MR. BELT:  Your Honor, I think there are two

6    ways you -- I don't think so, but I think there are two

7    ways Your Honor can address, I suppose, the motion to

8    dismiss.  One way is to grant it with permission to

9    replete.  The other way is to grant it without

10   permission to replete.

11         In some cases, and this was, I think, the

12   thrust of a good part of Mr. Gilbert's argument, there

13   is no way that additional specificity is going to cure

14   the speculative nature of the alleged damages.  In

15   other words, giving a specific date on which specific

16   communications happened, is not going to satisfy the

17   high proximate cause requirement of a civil RICO

18   complaint.  So I don't think that with respect to those

19   claims, that the two really are different arguments

20   altogether.

21         I'm addressing the dilemma, and should Your

22   Honor not dismiss the RICO claim, the defendants are

23   left at sea on this complaint, even as supplemented by

24   the standing order compliance, concerning what it is

25   that each individual defendant is alleged to have done,

1   and when that defendant is alleged to have done it.

2   There's absolutely nothing in either the complaint or

3   the compliance with the standing order, that gives the

4   defendants any information concerning which -- what

5   each individual defendant is alleged to have done, and

6   what that defendant is -- when that defendant is

7   alleged to have done it.

8           Now, the plaintiff's answer to that is,

9   "Well," this  really -- "this requirement can't be

10  imposed," citing a recent second circuit decision, "you

11  can't elevate a pleading requirement in a standing

12  order, such that you can't dismiss a complaint by

13  erecting a pleading requirement greater than the

14  pleading rules require, with respect to a RICO claim."

15          I suggest, Your Honor, that this argument

16  really proves too much, in this sense.  If the

17  plaintiff's argument is accepted, it really effectively

18  does away with the RICO case order altogether, because

19  all they have to say is that, "Well, our complaint

20  satisfies the pleading requirement, the notice pleading

21  requirement under the federal rules, and therefore, the

22  RICO case order can't impose a greater requirement,

23  therefore, no sanction can be imposed for failing to"

24  satisfy a -- to "provide an adequate RICO case

25  statement."

1              Now, I concede, Your Honor, that under the

2      circumstances of this case, where discovery has been

3      stayed, and there's only been one attempted compliance

4      with the RICO case order, that under the recent second

5      circuit decision, it probably would be inappropriate to

6      dismiss the complaint, merely based on failure to

7      comply with the RICO standing order, however, as the

8      plaintiffs admit, now that the criminal case has been

9      tried, they have a lot of information that they did not

10     have at the time they filed their complaint, therefore,

11     there is no reason, at this point, why, should Your

12     Honor not dismiss the RICO counts, we believe for the

13     reasons that Mr. Gilbert argued, those counts should be

14     dismissed, that the plaintiff should not be required to

15     fully comply with the RICO case order.  It's simply not

16     an argument to say, "Well, we didn't have the

17     information when we filed it.  We didn't comply, but we

18     didn't have the information when we filed it.  Now that

19     we have the information, we don't have to comply

20     because this is a matter that should be handled in

21     routine discovery."

22             Where would we be if we filed the discovery?

23     You file discovery, the other side either complies or

24     objects.  The Court enters an order, and orders certain

25     information to be furnished.  We're already there.  The

1    RICO case order is a court order requiring that certain

2    information be supplied when the plaintiff files a RICO

3    civil action.

4         What I suggest, Your Honor, that should you

5    not dismiss the RICO counts, now that the plaintiff

6    concedes that it has information that it did not have

7    when it filed its initial RICO case statement, that it

8    should be required to fully comply with the standing

9    order in civil RICO cases.

10         Thank you, Your Honor.

11         THE COURT:  Anyone else?  Mr. Gallagher?

12         MR. GALLAGHER:  Mr. Belt, Your Honor, is

13    correct with respect to the fact that we have a lot

14    more information, but certainly, the defendants were

15    put on notice by the RICO statement, of the nature of

16    the claim for each racketeering act, and roughly the

17    time period.

18         The time periods, we were unable to specify,

19    as we can now.

20         THE COURT:  You're not suggesting, are you,

21    Mr. Gallagher, they you're somehow exempt from the

22    requirement to file the RICO statement?

23         MR. GALLAGHER:  Oh, no.  Oh, no, and we did

24    the best we could with the facts we had at the time.

25         THE COURT:  No, but, I mean, let's assume the

1    scenario that Mr. Belt suggested is a possibility, that

2    if I deny the motion to dismiss --

3            MR. GALLAGHER:  We would not be adverse to

4    supplementing --

5            THE COURT:  But I would -- But required you

6    to file a RICO case statement, you'd have to do that.

7            MR. GALLAGHER:  Well, we've done one already.

8            THE COURT:  You've done it already?

9            MR. GALLAGHER:  Yes.  There's one on file.

10           THE COURT:  When did you file that?

11           MR. GALLAGHER:  Mr.--

12           MR. SWEENEY:  Your Honor, we filed it within

13   the time frame -- time framework of --

14           THE COURT:  But I think Mr. Belt is

15   suggesting now, that it's inadequate.

16           Is that your --

17           MR. GALLAGHER:  That's his argument, Your

18   Honor, and our response to that is, we set out in our

19   brief that, you know, the -- there's no guessing here,

20   as to what the nature of the claim was for each

21   racketeering act, and the time frame and the manner, is

22   that we've set it out -- Our claim is that we've set it

23   out adequately.

24           We did -- We were unable to specify, and in

25   some instances you'll see dates that are a year or two

1    years long.  We can specify the time frame much better

2    now, but there's no question that the RICO statement,

3    we did file, Your Honor, and the -- it certainly puts

4    the defendants on notice.

5          We claim that the specificity they're looking

6    for, that the -- can certainly be developed in

7    discovery.

8          The -- To talk about the CUTPA for a moment,

9    I just want to call your attention, Your Honor, when

10   Mr. Belt says that there's not a -- even an allegation

11   as to what these defendants do, there is.

12         From paragraphs 5 to 18 of the complaint

13   (unintelligible) out each individual defendant, and

14   what he or she -- or he does, or what it does.

15         For example, Lenoci, it's alleged he's a real

16   estate developer and property management, at paragraph

17   4.  He controlled the corporate entities that we've

18   mentioned, and that he was the altar ego, both for --

19   that's in paragraph 27, and I -- this is laid out in

20   the complaint, and we're not gonna -- I'm not gonna go

21   through it, but the fact is that we did allege the role

22   of each defendant in this -- in the CUTPA claim in this

23   matter.

24         The question is whether the plaintiff has a

25   cause of action for CUTPA, and the case law seems to

1    indicate that if the activity is incidental to the

2    business activity of the defendant, then the Court will

3    dismiss it, or strike it, if it's a state court action.

4    Here, we're talking about the development of Steel

5    Point.

6            All of the defendants, from the municipal

7    defendants to the individual engineers, architects,

8    attorneys, everyone, and developers themselves,

9    everyone is involved in that activity.  It's clear that

10   the principal activity of these defendants, with

11   respect to Steel Point, was the development of Steel

12   Point, and we -- I believe that if you read the

13   complaint, paragraph 133, which is in Count Seven,

14   incorporates 1 through 19, and 25 to 39, and 47 to 102

15   of the complaint, and if you read the complaint in that

16   fashion, it's clear that the -- it's not an incidental

17   activity of the defendants, and it's a primary

18   activity, and there (unintelligible) and as a result,

19   the allegations are sufficient.

20           There is, and we do concede that there is a

21   split of authority in this state and this Court, but in

22   state courts, as to whether you specifically have to

23   allege that it's their principal trade or activity, and

24   now those buzzwords aren't used, but it's clear what

25   the activities are, and what these particular

1    defendants do.

2              With respect to the statutory fed claim, all

3    I can tell you is the claim here is not -- They stole

4    development rights.  That's the argument, and that's a

5    sufficient, identifiable piece of property, the

6    development rights, pursuant to the contract that was

7    entered into, which the defendants stole, and that

8    comes within the purview of 52-564 of the General

9    Statutes, and I think that's all I can say about that

10   issue.

11             Thank you.

12             THE COURT:  Mr. Belt?

13             MR. BELT:  Even more briefly, Your Honor, on

14   the Unfair Trade Practices Act count, the complaint is

15   long.  The first RICO case statement they filed is even

16   longer.

17             You can search high and low and, with respect

18   to a number of the defendants, you will not find

19   anything that alleges what business they were even in,

20   much less that the activities complained of in the

21   unfair trade practices count were in the conduct of

22   their primary business.

23             With respect to the statutory theft count,

24   Mr. Gallagher concedes that its development rights that

25   he's talking about, these are contract rights, these

1    are intangible property, and the case law is quite

2    clear that intangible property does not come within the

3    scope of the statutory theft statute.

4              That you, Your Honor.

5              THE COURT:  Okay.  Thank you.

6              Anything else from anyone?

7              (No audible response. )

8              THE COURT:  All right.  Thank you.

9          (Proceedings concluded at 11:10 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.


_____          May 14, 2008

STEPHEN C. BOWLES